**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**PATRICIA LYNNE PETRIE,**

     **Plaintiff,**

**vs.**                                             **CIVIL ACTION NO. 3:19-CV-00510**

**ANDREW SAUL,**
**COMMISSIONER OF SOCIAL SECURITY,**

     **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered July 11, 2019 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 12, 17)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (ECF No. 12), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 17); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff, Patricia Lynne Petrie (hereinafter referred to as "Claimant"), protectively filed her applications for Titles II and XVI benefits on May 13, 2015 alleging that her disability began on March 1, 2010[1] because of osteoporosis, arthritis, bipolar, PTSD, social anxiety, and SADD.[2] (Tr. at 13, 280) Her claims were initially denied on August 25, 2015[3] (Tr. at 129-133, 134-138) and again upon reconsideration on April 22, 2016 (Tr. at 151-159, 144-150). Thereafter, Claimant filed a written request for hearing on June 16, 2016. (Tr. at 160-161)

An administrative hearing was held on January 24, 2018 before the Honorable Laura Bernasconi, Administrative Law Judge ("ALJ"). (Tr. at 32-68) On May 30, 2018, the ALJ entered an unfavorable decision. (Tr. at 10-30) On July 30, 2018, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 258-261) The ALJ's decision became the final decision of the Commissioner on May 9, 2019 when the Appeals Council denied Claimant's Request. (Tr. at 1-7)

On July 10, 2019, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Brief in Support of Judgment on

---

[1] At the administrative hearing, Claimant amended her alleged onset date to January 23, 2014, when she turned 50 years old. (Tr. at 13, 36, 278)

[2] Claimant alleged that she stopped working on March 1, 2010 "[b]ecause of other reasons" and explained that she stopped because she had a hysterectomy "and then just couldn't go back because of other medical conditions." (Tr. at 280)

[3] In her Disability Report-Appeal, submitted in October 2015 after the initial level of review, Claimant alleged that she experienced increased depression as it related to her bipolar disorder, as well as increased nervousness and panic attacks due to her social anxiety disorder which resulted in an increasing number of therapy appointments. (Tr. at 321)

the Pleadings (ECF No. 12); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (ECF No. 17)

**Claimant's Background**

Claimant was 50 years old as of the alleged amended onset date and considered a "person closely approaching advanced age" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(d), 416.963(d). (Tr. at 23) Claimant has a high school education and is two classes short of receiving an Associate's degree in business management. (Tr. at 38, 50) Her work history includes employment as a sandwich maker at a restaurant, hotel housekeeping, and as a cashier. (Tr. at 38-40)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and

how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional

capacity. <u>Id</u>. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

<u>Id</u>. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through June 30, 2014. (Tr. at 15, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date of January 23, 2014. (<u>Id</u>., Finding No. 2) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: osteoporosis; osteoarthritis; bulging discs; bipolar disorder; anxiety; posttraumatic stress disorder (PTSD); and substance abuse disorders. (Tr. at 16, Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (<u>Id</u>., Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except she can occasionally climb stairs and ramps, but never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She should avoid concentrated exposure to extreme cold, heat, and vibration. She

should avoid even moderate exposure to hazards such as moving machinery or unprotected heights. She can perform simple, repetitive work not on a production rate system (i.e., no assembly line work) in a static work environment with little or no change. She can occasionally interact with supervisors and coworkers, but can have no interaction with the general public.

(Tr. at 19, Finding No. 5)

At step four, the ALJ found Claimant was capable of performing her past relevant work as a hotel housekeeper. (Tr. at 22, Finding No. 6) The ALJ also made an alternative finding at the final step and determined that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there are jobs that exist in significant numbers in the national economy that Claimant can perform, to-wit: a merchandise marker; routing clerk; and labeler/marker. (Tr. at 23-24) Finally, the ALJ determined Claimant had not been under a disability from January 23, 2014 through the date of the decision. (Tr. at 24, Finding No. 7)

## Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the ALJ erred on numerous grounds. First, the ALJ neglected to mention or weigh the psychological opinion provided by Angela Null, M.S., and this omission prejudiced the ALJ's credibility analysis as well as the resulting RFC assessment to the extent that not all of Claimant's mental limitations were considered. (ECF No. 12 at 5-6) Further, the ALJ's RFC assessment is fatally flawed because it did not properly accommodate Claimant's physical limitations which are noted in the medical records from David Rupp, M.D. and Marshall Health. (Id. at 6) The ALJ's finding Claimant could perform light work is erroneous because Claimant should have been found disabled pursuant to "Grid Rule 201.12" as of her amended onset date of January 23, 2014 when she turned 50 years old. (Id. at 6-7) Finally, the combination of Claimant's

mental and physical impairments precludes all substantial gainful activity. (Id. at 7)

Claimant asks this Court to reverse the decision below and award her benefits, or alternatively, remand this case to correct the errors below. (Id. at 7)

In response, the Commissioner argues that under the Regulations, Ms. Null's evaluation findings were not a "medical opinion" that needed to be weighed, and her diagnoses and prognosis are insufficient to the extent that they are a medical opinion because they did not indicate what Claimant could or could not do or how these impairments impacted her abilities, let alone her functioning. (ECF No. 17 at 13-15) Further, it appears the ALJ did consider Ms. Null's report despite not mentioning it, because the ALJ's findings with respect to Claimant's mental impairments were consistent with Ms. Null's. (Id. at 16) Even if Ms. Null's report could be construed as a medical opinion, the ALJ's failure to explicitly address it is harmless error because it is unlikely that the ALJ would have arrived at a different conclusion. (Id.)

Significantly, when assessing Claimant's RFC, the ALJ reviewed the mental health evidence from Prestera which was consistent with both Ms. Null's examination findings and Dr. Rupp's observations. (Id. at 17) The ALJ considered the opinion evidence from the State agency psychological consultant, Dr. Smith, who had an opportunity to review Ms. Null's report, therefore, the ALJ implicitly considered Ms. Null's report when evaluating Dr. Smith opinion. (Id.) The ALJ assigned no weight to the State agency psychological opinion upon finding it inconsistent with the record as a whole, which shows the ALJ fairly considered all of the mental health evidence despite not explicitly commenting on Ms. Null's report. (Id.) Because Claimant fails to specify any prejudice by the ALJ's omission of mentioning Ms. Null's report and the RFC finding is supported by substantial evidence, Claimant's argument for reversal or remand lacks

merit. (Id. at 18)

With regard to the physical RFC, the Commissioner argues that the ALJ considered all the relevant medical evidence, including the records provided by Dr. Rupp, and other evidence of record, which supported the ALJ's limiting Claimant to light work. (Id. at 19-20) The ALJ's RFC finding was also consistent with the State agency medical consultants' opinions. (Id. at 20) The ALJ's physical RFC assessment was not "out of touch with the medical evidence of record" as Claimant contends, but was a fair and reasonable review of the evidence and any conflicts therein were reconciled by the ALJ pursuant to her duty. (Id. at 21)

The ALJ's credibility assessment complied with Social Security Ruling ("SSR") 16-3p and provided a reasoned explanation for why she found Claimant's allegations of disabling symptoms were not consistent with the objective evidence. (Id. at 22)

The Commissioner asserts that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 23)

**The Relevant Evidence of Record**[4]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Summary of Relevant Physical Impairment Evidence:[5]

Claimant had a history of treatment for various physical impairments, including

---

[4] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.
[5] The relevant period before the ALJ was from January 23, 2014, Claimant's amended alleged onset date, through May 30, 2018, the date of the ALJ's decision. (Tr. at 13-14) For purposes of Claimant's DIB claim, the relevant period is shorter, Claimant would have to show that she was disabled on or before June 30, 2014, her date last insured ("DLI"). (Tr. at 13-14, 276) See 20 C.F.R. § 404.101(a), 404.131(a).

hypertension, as well as osteoarthritis/low back pain (Tr. at 375-381, 383-387, 389-398, 400-404, 530, 643-644, 700-702, 717-718).

In mid-2015, she was treated for bilateral foot pain due to low-impact fractures of the metatarsal bones in her feet (Tr. at 375-377, 427-430, 501-502, 537-540, 589, 599-601, 658-659, 664-666, 689). Osteoporosis was a concern because of Claimant's previous history of substance abuse (Tr. at 378). A bone density (DEXA) scan showed normal to borderline evidence of osteopenia (Tr. at 581, 700). Claimant was prescribed Fosamax for treatment (Tr. 702, 1027, 1030).

X-rays of Claimant's feet between April and June 2015 showed multiple stress fractures in various stages of healing in her left foot and right foot (Tr. at 405, 407, 430, 446, 517, 540, 549, 601, 681, 684, 687-688, 692). Claimant complained of swelling in both feet, as well as pain, exacerbated by ambulation and direct palpation (Tr. at 684, 689-690). She was initially fitted with Darco shoes and prescribed crutches (Tr. at 541, 685, 688). She was later advised to wear hard-soled shoes when ambulating and weightbearing (Tr. at 692, 676, 678-79, 684). In August 2015, Claimant wore regular shoes and refractured her second metatarsal bone in her right foot (Tr. at 677-678). She was advised to wear a hard-soled shoe on her right foot while it healed (Tr. at 678). Claimant's preference, however, was to walk in her regular shoes (Tr. at 672). The fractures eventually healed (Tr. at 672, 674, 958, 1027, 1035, 1173, 1310). As early as December 2015, Claimant's primary care physician, David Rupp, M.D., reported that Claimant's gait and station were normal (Tr. at 961). Examination of Claimant's joints, bones, and muscles were normal (Id.). In February 2016, Claimant's gait was non-antalgic; she could walk on her heels and toes without difficulty or pain (Tr. at 1361). In June 2016, Claimant walked and stood unassisted; her gait was

again noted to be non-antalgic (Tr. at 1374).

In August 2016, Claimant was briefly treated by a podiatrist for right foot pain (Tr. at 1391-1396). Although no new fracture line was visible on the x-ray, an early stress fracture of her right fifth metatarsal could not be ruled out and Claimant was advised to wear a walking boot for about three weeks (Tr. at 1392, 1395). In a follow-up appointment three weeks later, Claimant reported improvement with her right foot symptoms (Tr. at 1391).

Claimant reinjured her right foot in September 2016 and again in February 2017, when she slipped and fell while walking her dog (Tr. at 1039-1041, 1058-1059, 1107-1109, 1242-1243). On both occasions, Claimant was diagnosed with a foot sprain (Tr. at 1059, 1041). X-rays of Claimant's right foot showed old healed fractures, but no acute fractures or abnormalities (Tr. at 1173, 1310). In October 2016, Claimant's gait was noted to non-antalgic and she stood and walked unassisted (Tr. at 1374, 1385).

In addition to bilateral foot pain, Claimant was treated for complaints of low back pain between 2014 and 2017 (Tr. at 379-381, 389-391, 694-698, 958-961, 1030, 1034, 1050, 1060-1064, 1070-1073, 1079-1083, 1356-1392, 1363, 1366, 1370-1377, 1384-1388). An MRI of Claimant's lumbar spine in November 2015 showed a disc bulge at L4-L5 with some stenosis (Tr. at 890, 1360). An MRI of Claimant's thoracic spine, taken on the same day, showed normal findings, including no evidence of a previously seen lower thoracic syrinx (Tr. at 481-482, 889-890). An updated x-ray of Claimant's lumbar spine in February 2016 showed degenerative disc disease at L4-L5 and degenerative facet disease bilaterally at L4-L5 and L5-S1 (Tr. at 1353). Claimant was diagnosed with spondylosis in the lumbosacral region without myelopathy or radiculopathy (Tr. at 1030, 1034, 1049). There was no evidence of nerve root compression (Tr. at

11

1370, 1386).

In November 2016, Claimant was treated for acute swimmer's ear subsequent to swimming at the YMCA (Tr. at 1046-1050).

Regarding Claimant's low back, physical examinations showed tenderness of her lumbar spine, some decreased range of motion, and occasional positive straight leg raising (Tr. at 380, 386, 394, 696, 1361). Other physical examinations, however, showed negative straight leg raising (Tr. at 390, 394, 696), normal neurological findings, including normal sensation and reflexes (Tr. at 386, 956, 961, 1049, 1059, 1063, 1069, 1082, 1184,1374, 1385), and normal gait and stance (Tr. at 390, 961, 956, 1049, 1073, 1063, 1087, 1361, 1374, 1385).

Claimant was prescribed medications for low back pain (Tr. at 377, 381, 386-387, 391, 395, 645, 698, 702, 1030, 1034, 1038, 1050, 1064, 1073, 1083). She also participated in pain management and received facet joint injections for lumbosacral spondylosis and trigger point injections for myofascial pain syndrome (Tr. at 1362, 1363, 1366, 1370-1371, 1376, 1380-1383, 1386-1387[6]; see also Tr. 1027, 1031, 1046, 1070, 1079, 1362, 1363, 1366, 1370). She reported some improvement with these injections (Tr. at 1027, 1060, 1070, 1384, 1386). None of Claimant's treating physicians recommended surgery for her back problems.

State Agency Medical Opinion Evidence:

In August 2015, Aurelio R. Gomez-Castil, M.D., a State agency medical consultant, reviewed the record at the initial level and opined that, notwithstanding Claimant's history of metatarsal fractures and chronic back pain, she retained the capacity to perform a reduced range

---

[6] The record shows that Claimant participated in pain management and received injections from February 3, 2016 to November 8, 2016.

of light work with postural and environmental limitations (Tr. at 75-77). In March 2016, Narendra Parikshak, M.D., a State agency medical consultant, reviewed the updated record at the reconsideration level and affirmed Dr. Gomez-Castil's opinion (Tr. at 104-106).

Summary of Relevant Mental Impairment Evidence:

Claimant had a history of mental impairments, including depression and a past history of substance abuse, of which she was in remission since 2012 (Tr. at 377-378, 668, 787, 792, 821, 964-965, 967).[7]

Claimant's primary care physicians diagnosed depression and occasionally prescribed psychotropic medications for treatment (Tr. at 375, 377, 379, 381, 387). In November 2016, February 2017, and May 2017, Dr. Rupp characterized Claimant's depression as mild (Tr. at 1034, 1038, 1046, 1050). Dr. Rupp often reported Claimant's mood and affect as normal on examinations (Tr. at 956, 961, 1030, 1034, 1038, 1049, 1063, 1069, 1073, 1082, 1087).[8]

Beginning in August 2015, Claimant also sought outpatient treatment at the Prestera Center for symptoms of depression and bipolar disorder, including mood swings, agoraphobic feelings, and difficulty being around other people (Tr. at 786-802, 820-32). Claimant was prescribed medications and received some individual therapy (Tr. at 971-979, 982, 993, 998, 1008, 1013, 1018, 1023). Claimant generally denied hallucinations, delusions, or thoughts of self-harm (Tr. at 794, 971-972, 974-975, 977-978, 980-981, 985-986, 991-992, 996-97, 1000-1001, 1006-1007,

---

[7] Although reported to be in remission, Claimant admitted to a mental health therapist in July 2017 that she relapsed a month earlier on June 3, 2017 and used some heroin (Tr. at 972). Claimant was convicted of heroin distribution and was briefly incarcerated between February 2015 and March 2015 (Tr. at 727, 755, 787-788, 821, 827, 965, 980, 985). Claimant was placed on supervised probation for five years beginning in 2015 (Tr. at 51, 326, 788, 826-827, 965, 980, 985).

[8] In December 2015, Claimant was hospitalized for two days for altered mental status due to an accidental drug overdose of DayQuil and NyQuil (Tr. at 842, 849, 892, 894).

1011-1012, 1016-1017, 1021-1022). Although Claimant sometimes had a dysphoric or sad affect, examinations starting in September 2015 showed that she generally had a cooperative attitude, intact memory, intact thought processes, appropriate thought content, good or fair concentration, intact or fair/partial insight, and intact judgment (Tr. at 793-794, 971-972, 974-975, 977-978, 980-981, 985-986, 991-992, 996, 1000-1001, 1006-1007, 1011-1012, 1016-1017, 1021-1022). In August 2016, Claimant reported to a treating psychiatrist that she graduated from a junior college with a degree in business management (Tr. at 980). Claimant's last treatment note was in September 2017 which indicated that Claimant's mental status examination was grossly normal with a fair prognosis (Tr. at 985-989).

Consultative Psychological Examination:

On March 28, 2016, Angel Null, M.S., performed a consultative psychological evaluation of Claimant (Tr. at 963-968). Claimant rode her bike to the appointment, which was approximately one block away (Tr. at 963). She alleged having recurrent major depressive and manic episodes, panic disorder, and chronic daily pain interfering with her functioning (Tr. at 964). She also presented with a history of polysubstance use and dependence in remission (Id.).

With regard to social functioning, Claimant reported that she generally went to the grocery store and ran errands once a week (Tr. at 967). She visited friends at her NA meetings and went to her daughters' and visited her grandchildren once a week (Id.). She talked on the telephone approximately once a week (Id.). She did not go to the mall, but went to movies once every six months (Id.). She walked or biked everywhere (Id.). She attended medical appointments as scheduled and she attended church (Id.). She had one close friend and she managed her finances independently (Id.). She reported that she received financial assistance by way of a medical card

14

and a stipend from school (Id.).

With regard to daily activities, Claimant reported that she performed all basic living duties independently, with exception of requiring some assistance with lifting (Id.). She did a little housework, including cleaning up her room (Id.). She was capable of cooking, doing laundry, dishes, sweeping, and other similar chores (Id.). She described her daily routine as attending at least one NA meeting per day (Id.). She attended college three days a week from 9:45 a.m. to 2:30 p.m., attended church with her family on Sundays, went to therapy once every two weeks, took her medication, and spent time at the Wellness Recovery Center (Id.).

On examination, Ms. Null reported that Claimant was adequately groomed and cooperative with the examiner (Tr. at 966). She established direct eye contact (Id.). Her speech was logical and coherent (Id.). She was oriented to person, place, date, and time (Id.). Her mood appeared mildly dysphoric and her affect was mildly constricted (Id.). Her thought processes were connected (Id.). Her thought content was appropriate, i.e., no indication of obsessions, compulsions, or paranoid ideation (Id.). She had no unusual perceptual experiences, although she reported paranoia in the past, which was thought to be related to her substance use (Id.). Her judgment and insight were intact, as was her memory (Id.). Her concentration was adequate and her persistence and pace were normal (Id.). Her social functioning was considered mildly deficient (Id.).

Ms. Null diagnosed Claimant with bipolar disorder, somatic symptom disorder with persistent pain, panic disorder, and alcohol use disorder in early remission (Tr. at 966-967). Ms. Null stated that Claimant's prognosis was poor and stated that Claimant might require some assistance to manage her finances based on her history of polysubstance abuse (Tr. at 967). Ms. Null did not provide an assessment of Claimant's ability to perform work-related mental activities.

<u>State Agency Psychological Opinion Evidence:</u>

In August 2015, Frank Roman, Ed.D., a State agency psychological consultant reviewed the record at the initial level of review and concluded that Claimant did not have a severe mental impairment (Tr. at 74-75). Specifically, Dr. Roman opined that Claimant had only a mild restriction of activities of daily living; mild difficulties in social functioning; mild difficulties in maintaining concentration persistence or pace, and no repeated episodes of decompensation (Tr. at 74). At the reconsideration level in April 2016, Rosemary L. Smith, Psy.D., reviewed the updated record, including Ms. Null's consultative report, and affirmed Dr. Roman's opinion that Claimant did not have a severe mental impairment (Tr. at 101-102).

**The Administrative Hearing**

<u>Claimant Testimony:</u>

Claimant testified that she could not work because of her mental impairments and because of her arthritis in her low back and osteoporosis in her feet. (Tr. at 41) She stated that she had constant pain in her lower back and toes. (Tr. at 41, 54) She testified that her pain medication helps dull the pain most of the time and that she received injections at a pain clinic which did not seem to help. (Tr. at 41-42) She stated that back surgery was never suggested (Tr. at 42) and that despite her history of fractured metatarsals in her feet, her bones never had to be reset or put in a cast (Tr. at 43). She stated that she used crutches for a short time, but otherwise wore special orthopedic shoes for about six weeks when she had a stress fracture or a broken bone in her foot (<u>Id</u>.). The last time she had a broken bone in her foot was in 2015; she estimated that typically took six to eight weeks for her fractures to heal (<u>Id</u>.).

With regard to her mental impairments, Claimant testified that she experienced blackouts

due to PTSD as well as panic attacks due to social anxiety. (Tr. at 44) She stated that she had panic attacks at least once a week and they last about two minutes, but it takes her about three hours to recover from them. (Tr. at 45) She stated that she has trouble dealing with authoritative figures which has interfered with her ability to hold down a job. (Tr. at 47) She testified that she takes Abilify, Lexapro, Klonopin, Vistaril and Ritalin and stated that her medication has helped. (Tr. at 44)

Claimant testified that she got around town by taking the bus or walking; she let her driver's license lapse in 2004 but lacked the courage to take the driver's test again (Tr. at 46). She described a typical day as getting up, taking her medication, taking care of her dog and cat, and taking care of some household duties, depending on her depression (Id.). She went to NA meetings and she went out once a week to visit a friend (Id.). She also visited with her adult children and grandchildren (Tr. at 49-50) and she went to church every Sunday when she could (Tr. at 60). She otherwise read and watched a lot of television during the day (Tr. at 46, 55).

Vocational Expert ("VE") Testimony:

The VE testified that a hypothetical individual with Claimant's vocational profile and reduced light RFC as found by the ALJ could perform Claimant's past relevant work as a hotel housekeeper, as well as perform other occupations in the national economy, including work as a merchandise marker, routing clerk, and labeler/marker. (Tr. at 64-65)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular
> conclusion. It consists of more than a mere scintilla of evidence but may be
> somewhat less than a preponderance. If there is evidence to justify a refusal to direct
> a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape

their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists,

the Court must affirm the Commissioner's decision "even should the court disagree with such

decision." Blalock, 483 F.2d at 775.

## **Analysis**

### Evaluation of Opinion Evidence:

Because Claimant takes issue with the ALJ's evaluation of the opinion evidence as it relates

to the report provided by Ms. Null, as a practical matter it is best to review how the SSA governs

the criteria for evaluating opinion evidence prior to addressing the ALJ's RFC assessment and fifth

step determination; per §§ 404.1527(a)(1), 416.927(a)(1):

> Medical opinions are statements from acceptable medical sources that reflect
> judgments about the nature and severity of your impairment(s), including your
> symptoms, diagnosis and prognosis, what you can still do despite impairment(s),
> and your physical or mental restrictions.

The Regulations provide that an ALJ must analyze and weigh every "***medical opinion***" received

into evidence, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(1)-(6),

416.927(c)(1)-(6) (emphasis added). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Other than Ms. Null's diagnoses of bipolar disorder, somatic symptom disorder with persistent pain, panic disorder and alcohol use disorder in early remission, that Claimant's prognosis was "poor" and she would require assistance to manage her funds due to her history of polysubstance abuse, Ms. Null provided no opinion with respect to what Claimant can still do despite these mental impairments. In addition to her burden of showing she has a medically determinable impairment, Claimant must demonstrate "a showing of related functional loss." See, Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (internal citation omitted). To that extent, the ALJ's omission of evaluating the report provided by Ms. Null did not offend legal standards because this evidence simply did not rise to the definition of "medical opinion" triggering the ALJ's duty to weigh this evidence.

The ALJ is nevertheless required to consider "all evidence" in the case record. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). As noted by the parties, there is no dispute that the ALJ does not explicitly reference or mention Ms. Null's findings. It is known that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014); see Dobbing v. Colvin, 2016 WL 6246495, at *3 (D.S.C. Oct. 26, 2016) (cautioning that even in view of Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016), " 'an ALJ's failure to cite specific evidence does not indicate that it was not considered' " (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000))). Notably, the report from Ms. Null's consultative examination is listed under the List of Exhibits attached to the written decision. (See "HO 12F"; Tr. at 30) Significantly, the ALJ found that "no psychological consultant designated

19

by the Commissioner" found Claimant's mental impairments met Listing requirements. (Tr. at 19) Of interest here is that at the reconsideration level of review, Dr. Smith reviewed the consultative examination report provided by Ms. Null[9] (Tr. at 95, 100, 101, 104) and determined not only had Listing criteria not been met, but also Claimant's mental impairments were "non severe" (Tr. at 101-102). However, the ALJ assigned "no weight" to the opinions provided by State agency psychological consultants after finding they were "inconsistent with the overall record as a whole including the treatment notes from Prestera." (Tr. at 22) Of importance here is that Ms. Null's report indicated that Claimant's mental status examination produced normal findings, and during the evaluation her social functioning was found to be only mildly deficient, and that Claimant was capable of performing all basic living duties independently. (Tr. at 965-967) Clearly, the ALJ complied with the dictates of the Regulations and considered all the evidence in the record – in short, there is no indication that the ALJ failed to consider Ms. Null's consultative examination that would warrant remand.

In sum, the undersigned **FINDS** that that the ALJ's omitting any assigned value to the consultative examination report provided by Ms. Null complies with the Regulations and with this Circuit's jurisprudence, and is therefore not erroneous.

The Credibility Assessment:

Claimant has stated that the ALJ erred when she found Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the evidence of record in light of the evidence of record as well as Ms. Null's psychological evaluation report.

---

[9] Of further interest is that Ms. Null's consultative examination report is specifically **not** categorized as "opinion" evidence. (Tr. at 95)

(ECF No. 12 at 6) In this case, the ALJ properly applied the two-step process espoused by Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), and then proceeded to review Claimant's subjective complaints, which included her testimony, and reconciled them with the medical evidence of record. (Tr. at 19-22) The ALJ is bound by SSR 16-3p, which clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the consistency of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Davis v. Colvin, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8,

2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

The ALJ began her analysis of Claimant's initial allegations that she is unable to work because of osteoporosis, arthritis, bipolar disorder, anxiety, PTSD, and SAD. (Tr. at 20, 279-286)[10] With respect to her physical impairments, the ALJ considered Claimant's testimony that she was in constant pain "because her osteoporosis breaks the bones in her feet just by walking." (Tr. at 20) The ALJ noted that although Claimant did not use a walker or crutches, she acknowledged that Claimant wore special shoes whenever she had a stress fracture and that she stays off her feet when she has these fractures; the ALJ further noted that 2015 was the last time Claimant had a fracture and that it healed after about eight weeks. (Id.) With respect to Claimant's back pain due to bulging discs, the ALJ acknowledged Claimant's statements the pain is dulled with medications and injections, however, she has not undergone surgery. (Id.)

Regarding her mental impairments, the ALJ noted that Claimant testified that she has panic attacks about once a week that requires a three-hour recovery and that she has black out spells and nightmares from PTSD from childhood abuse. (Id.) She also noted Claimant's testimony that because she is too anxious to take her driver's license test, she walks or takes the bus to go places. (Id.) The ALJ acknowledged Claimant's testimony that agoraphobia makes her unable to leave her home and that she is unable to get along with others or authority figures, but noted that she did leave her home once a week to visit a friend and to attend Narcotics Anonymous meetings. (Id.) She recognized that Claimant had a history of substance abuse, but has been sober for over five

---

[10] The ALJ referenced Claimant's Disability Report dated June 9, 2015.

years. (Id.) Finally, the ALJ noted that Claimant took a college class that was an 18-week course, but it took Claimant three years to complete and that she was only two classes short of completing an Associate's degree. (Id.)

Next, the ALJ considered the medical evidence of record with respect to her physical and mental impairments, noting that Claimant received only conservative treatment before and after her alleged onset date. (Id.)

With respect to Claimant's problems with feet fractures, despite Claimant's allegations of chronic spine and joint pain, the ALJ noted that the record showed she received minor treatments, and that she suffered fractures in her feet in mid-2015 after Claimant dropped a heavy kettle on them. (Tr. at 20, 405, 501) Though the ALJ acknowledged Claimant's feet fractures healed slowly and that she was unable to stand or walk for a significant length of time, Claimant's fractures healed after less than twelve months and she was able to stand and walk without significant limitations. (Tr. at 20, 672-693)[11] The ALJ noted that since then, Claimant received no treatments for any more broken bones up through the date of the hearing, which indicated that the broken bones were a "discrete occurrence rather than an ongoing injury requiring ongoing treatments." (Tr. at 20) The ALJ noted that the recent treatment records showed Claimant had "largely normal ranges of motion in both feet." (Id.)

With regard to Claimant's complaints of low back pain with radiation of numbness and tingling into the extremities, the ALJ noted that the medical records sometimes showed positive findings on straight leg raise tests bilaterally and other times, negative findings. (Tr. at 21, 696)

---

[11] The ALJ referenced the records from Marshall Orthopedics dated May 5, 2015 through October 6, 2015.

The ALJ acknowledged that diagnostic imaging studies showed mild degenerative changes in Claimant's lumbar spine and disc bulging, but no more significant findings. (Tr. at 21, 482, 1318-1390)[12] In addition to receiving physical therapy and pain management with injections, which Claimant reported provided "significant relief from her pain" (Tr. at 21, 694)[13], the ALJ noted that none of Claimant's doctors recommended surgery for her back problems. The ALJ further noted that in recent physical examination findings, Claimant "largely walks with a normal gait and station with no significant problems moving from seated to standing positions or walking for small distances. She has largely full range of motion and strength in her extremities." (Tr. at 21, 1027-1087)[14] Finally, the ALJ noted a citation in the medical record that Claimant "regularly swims at the YMCA suggesting she maintains a relatively active lifestyle with average levels of mobility." (Tr. at 21, 1047)[15]

Next, the ALJ reviewed the record as it related to Claimant's mental impairments, noting that she had "received consistent treatments for symptoms variously diagnosed as bipolar disorder, depression, PTSD, and anxiety." (Tr. at 21) The ALJ recognized that the treatment records indicated Claimant's symptoms, including crying spells, insomnia, agoraphobia, mood swings, racing thoughts, and social phobias had waxed and waned in severity over time in response to life stressors, with the worst symptoms generally coinciding with Claimant's past periods of substance

---

[12] The ALJ referenced an MRI taken on November 20, 2015 as well as medical records from Cabell Huntington Hospital dated April 13, 2015 through February 17, 2017.

[13] This is from a treatment note from Dr. Rupp dated October 19, 2015.

[14] The ALJ referenced medical records from Dr. Rupp/Marshall Health dated February 17, 2016 through October 4, 2017.

[15] This is a treatment note dated November 28, 2016 concerning Claimant's complaining of symptoms related to acute swimmer's ear in her left ear. (Tr. at 1049)

abuse. (Tr. at 21, 803-841)[16] However, when Claimant was sober, the ALJ noted that her symptoms remained relatively stable and that Claimant reported improved symptoms after periods of good compliance with her medication and regular participating in counseling and group therapy. (Id.) Recognizing that Claimant never required emergency medical treatment or hospitalization as a result of her psychiatric symptoms, and that Claimant's mental health examinations were largely normal, the ALJ observed that the record indicated that Claimant's symptoms were mild to moderate. (Tr. at 21, 786-802)[17]

As for some inconsistencies with Claimant's allegations of totaling disabling mental impairments, the ALJ further observed that the record showed that Claimant frequently left her home to ride public transportation, go shopping and attend her medical appointments without significant problems which indicated she is capable of interacting with others when she chooses. (Tr. at 21) The ALJ further addressed these inconsistencies, noting that Claimant received some treatment for the alleged disabling impairments, but that treatment was essentially routine and conservative. (Tr. at 22) The ALJ noted that the record showed infrequent medical appointments as well as significant gaps in the treatment history. (Id.) Although Claimant did receive various forms of treatment for her impairments, the ALJ observed those treatments had been generally successful in controlling and alleviating her symptoms. (Id.)

In sum, the ALJ found that although the record does not dispute that Claimant has certain conditions which singly or in combination cause her limitations, ultimately, Claimant was not as limited by her impairments as alleged. (Id.) Accordingly, the ALJ's credibility analysis did not

---

[16] The ALJ referenced treatment notes from Prestera Center dated August 21, 2015 through November 20, 2015.
[17] The ALJ referenced treatment notes from Prestera Center dated August 26, 2015 through November 16, 2015.

offend Fourth Circuit jurisprudence, therefore, the undersigned **FINDS** that the ALJ's credibility assessment was supported by substantial evidence.

The RFC Assessment:

Claimant contends that the ALJ's RFC assessment is reversible error because Claimant's physical impairments preclude all employment, particularly at the light exertional level of work. (ECF No. 12 at 6) To that extent, Claimant argues that the ALJ committed reversible error for failing to find that Claimant's "grids out" as of January 23, 2014, her 50th birthday, pursuant to Medical-Vocational Rule 201.12. (Id. at 6-7)

Residual functional capacity represents the *most* that an individual can do despite her imitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

As noted *supra*, the ALJ compared Claimant's statements and testimony concerning her alleged disabling conditions with the objective and other evidence of record, and ultimately determined that the evidence simply did not support Claimant's allegations that she was so limited

that all substantial gainful activity was precluded. Because only the ALJ is tasked with determining the particular facts in a case and to resolve the inconsistencies therein, this Court does not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, the ALJ explicitly considered the assessments provided by the State agency medical consultants, both of whom determined that Claimant could perform work at the light exertional level; the ALJ found their opinions were consistent with the treatment record and with the hearing testimony, and gave them great weight. (Tr. at 22, 80-90, 93-109)[18] Of importance is that the ALJ expressly found that

> Specifically, her bilateral feet fractures heeled [*sic*] within twelve months, diagnostic testing of the lumbar spine shows mild degenerative changes in the lumbar spine such as disc bulging at L4-5, but no more significant findings, (Exhibits 2F pg.69 and 17F), she regularly swims at the YMCA and has taken college courses during the time period she has alleged disability. (Hearing Testimony)

(Tr. at 22, 482, 1318-1390)[19] From this evidence, it is clear that the ALJ properly considered the evidence relating to Claimant's physical impairments, therefore, the undersigned **FINDS** Claimant's argument that the ALJ's light RFC assessment "is totally out of touch with the medical evidence of record" (ECF No. 12 at 6) is without merit.

---

[18] It is notable that the State agency medical consultants' opinions are dated August 25, 2015 and April 22, 2016, at the initial and reconsideration levels of review respectively, however, as observed by the ALJ, the medical records documenting both Claimant's physical and mental impairments improved since then: the most recent treatment note from Dr. Rupp is dated October 4, 2017 which documents Claimant's ongoing complaints of back pain which "is exacerbated by bending over and by prolonged periods of walking" and that Claimant's symptoms improve with a facet injection and "waiting for an injection to the other side." (Tr. at 1027) As for her mental impairments, the record shows the last treatment note at Prestera Center is dated September 20, 2017 which shows that Claimant's mental status exam results were normal with a fair prognosis and recommendation to continue medications. (Tr. at 985-986, 988)

[19] As noted above, the ALJ references the November 20, 2015 lumbar MRI as well as the medical records from Cabell Huntington Hospital dated April 13, 2015 through February 17, 2017 which included a more recent radiology report of the lumbar spine dated February 2, 2016 that was followed by facet injections through the Hospital's Pain Management Center.

Moreover, it is important to appreciate this Circuit's recognition that hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As discussed above, the ALJ evaluated the evidence with respect to Claimant's allegation that she was totally disabled by her physical as well as her mental impairments, and found them to be inconsistent with the overall record. The vocational expert specifically testified that an individual with Claimant's vocational background, age, and education and limited to light work with the aforementioned postural and environmental restrictions could still perform her past relevant work as a hotel housekeeper, as well as other jobs in the national economy. (Tr. at 64-65) To the extent Claimant argues that her impairments would actually limit her to sedentary work and therefore preclude her from all work pursuant to the Medical-Vocational Rule 201.12, Claimant's contention is akin to a request that this Court should re-weigh the evidence, however, any conflicts within the evidence of record, as stated *supra*, which is for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Because the ALJ is only required to incorporate those limitations established by the record, the undersigned **FINDS** the ALJ's light RFC assessment is supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

### Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 12), **GRANT** the Defendant's

request to affirm the decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: December 30, 2019.



Omar J. Aboulhosn
United States Magistrate Judge